**WEYERHAEUSER CORPORATION,**
Plaintiff,

v.

**KOPPERS COMPANY, INC., Defendant.**

Civ. A. No. R–89–261.

United States District Court,
D. Maryland.

Feb. 1, 1991.

On Motion For Reconsideration
Feb. 26, 1991.

See also 771 F.Supp. 1420.

Mark L. Austrian, Collier, Shannon & Scott, Washington, D.C., for plaintiff.

J. Paul Mullen, Lord and Whip, P.A., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Pending before the Court are cross-motions for summary judgment filed by the parties in the above-captioned case. Plaintiff has moved for partial summary judgment on the issue of defendant's liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (Supp.1987). Defendant has moved for summary judgment on the issue of its liability to plaintiff under both the CERCLA and state law counts contained in plaintiff's complaint; defendant has also moved for summary judgment on its CERCLA counterclaim.

The motions have now been fully and extensively briefed by the parties. Pursuant to Local Rule 105.6, the Court shall decide these motions on the pleadings with no hearing.

## I. BACKGROUND FACTS

In 1944 Weyerhaeuser leased to Koppers's corporate predecessor the Baltimore property which is the subject matter of this

dispute. The lease was continuously extended from 1944 through 1977, and during those years, Koppers continuously used the property as a wood treatment facility, as was envisioned by the parties when they entered the lease. In 1977, the lease was allowed to expire, and Koppers dismantled its wood treatment facility.

From 1977 through 1986 Weyerhaeuser leased the property to Hobelmann Port Services for use as a storage lot for imported cars. In 1986, Weyerhaeuser agreed to sell the property to Hobelmann. In 1986, also, Weyerhaeuser undertook preliminary environmental studies, apparently in view of the impending sale.[1] The study was completed in November of that year, and it showed that the property was significantly contaminated with creosote, benzene, toluene, ethylbenzene, polyaromatic hydrocarbons, chromium, arsenic and copper. These are chemicals which are used, in various forms, in the treatment of wood. Further investigation has been done since that time. The most recent of the studies submitted by Weyerhaeuser (in its Reply in support of its motion for summary judgment) demonstrates that this contamination originated on the property in question and did not migrate from adjoining sites.[2]

Weyerhaeuser's complaint against Koppers asserts claims based both on CERCLA and state law. Koppers denies liability on all counts and has also asserted a CERCLA counterclaim against Weyerhaeuser.

On August 16, 1990 Weyerhaeuser filed a motion for partial summary judgment on the issue of Koppers's CERCLA liability. This was fully briefed on September 11, 1990. On November 19, 1990 Koppers filed its own motion for summary judgment asking the Court to rule that Koppers is not liable to Weyerhaeuser under CERCLA or any of Weyerhaeuser's state law claims,

and also asking the Court to rule that Weyerhaeuser is liable to Koppers on Koppers's CERCLA counter-claim. That motion was fully briefed on January 4, 1991.

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure serves the important purpose of "conserv[ing] judicial time and energy by avoiding unnecessary trial and by providing a speedy and efficient summary disposition" of litigation in which the plaintiff fails to make some minimal showing that the defendant may be liable on the claims alleged. *Bland v. Norfolk & Southern R.R. Co.*, 406 F.2d 863, 866 (4th Cir.1969). The applicable standards for analyzing a motion for summary judgment under Rule 56 are well-established. The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265. In determining whether the movant has sustained this burden, this Court must consider whether, when assessing the evidence in the light most favorable to the opposing party, a "fair-minded jury could return a verdict for [that party]...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Pulliam Investment Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). Nevertheless, the "mere existence of a scintilla of evidence in support of the [opponent's] position will be insufficient" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984). The non-movant must identify for the

---

**1.** As early as 1984, the State of Maryland had included this property on a list of sites which might contain controlled hazardous substances, and this listing continued through 1985 and 1986. Weyerhaeuser did not begin testing the property, however, until 1986.

**2.** Weyerhaeuser's expert opined that "based on this [observed groundwater] flow rate the con-

tamination located underneath the treatment facility could not have migrated from an adjacent source unless the contamination was introduced centuries ago." The expert also commented on the significance of the lack of contamination in the area to the south of the identified contamination.

Court some dispute of fact that is material to the legal issues presented in the case in order to successfully oppose a motion for summary judgment. "The plain language of Rule 56(b) mandates entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp*, 477 U.S. at 322, 106 S.Ct. at 2552. It is against these standards that the Court shall review the motions.

## III. WEYERHAEUSER'S MOTION

### A. *Introduction.*

■ Weyerhaeuser is seeking summary judgment as to Koppers's liability under Section 107 of CERCLA, 42 U.S.C. § 9607 which provides that:

"(a)(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance,

shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; [ ...]"

This section allows a private party who has incurred response costs because of a release or threatened release of hazardous material to bring an action and recover those costs. *See* § 9607–(a)(4)(B). In order to do so, the plaintiff must show that

"(1) the waste disposal site is a facility within the meaning of 42 U.S.C. § 9601(9); (2) a release or threatened release of a hazardous substance from the facility has occurred, *id.* § 9607(a)(4); and (3) the release or threatened release has caused the plaintiff to incur response costs that are consistent with the national contingency plan, *id.* § 9607(a)(4) and 9607(a)(4)(B)."

*Retirement Community Developers, Inc. v. Merine*, 713 F.Supp. 153, 155 (D.Md. 1989). Also, the defendant must be one of those covered in the listing set out above. *Id.*

### B. *Facility.*

Weyerhaeuser argues that the subject property is a "facility" within the meaning of the statute because hazardous substances have been "deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). The investigative tests performed at the request of Weyerhaeuser demonstrate that hazardous substances have indeed come to be located in the ground and groundwater there. Koppers does not dispute that this property is a "facility."

### C. *Proper Defendant.*

Second, Weyerhaeuser points out that Koppers is a covered person as is required by the statute because Koppers operated the wood treatment facility at the time when the chemical hazards were deposited, stored, or otherwise located in the property. Koppers has not asserted that it is not a proper defendant.

### D. *Release.*

Third, Weyerhaeuser asserts that a release has occurred as required. This is an assertion which Koppers disputes.

In support of its argument that a release of hazardous substances occurred at the site in question, Weyerhaeuser has produced the reports of environmental tests which were performed on the property. One study was performed by an organization of Weyerhaeuser's choosing; the other was done by the organization of Koppers's choice. The reports show that there are significant chemical deposits on the property. These various chemicals are "hazardous substances" as defined by CERCLA. *See* 42 U.S.C. § 9602, 40 C.F.R. § 302.4; 33 U.S.C. § 1317, 30 C.F.R. § 401.15.

Weyerhaeuser has also produced expert testimony that these chemicals did not migrate onto the property from some other parcel. *See supra* footnote 2. In addition, Weyerhaeuser has produced the affidavits of its Environmental Affairs Manager and its Real Estate Manager. The testimony contained in these affidavits goes to show that neither Weyerhaeuser nor any of its pre-Koppers lessees conducted pressure wood treatment operations at the site prior to 1944, the date of Koppers's lease.

Koppers has not disputed the accuracy of the investigative environmental studies which were performed. In its opposition to Weyerhaeuser's motion for summary judgment, Koppers was willing to assume the accuracy of the findings and argue its other points. In its own motion for summary judgment, Koppers did not even discuss the issue of whether a release had occurred.[3] In other words, there has been no serious question as to the validity of the studies and their conclusion: that hazardous substances are present on the property.

Instead, Koppers argues that there has been no showing as to how or when any release of these hazardous substances occurred, and without this specific showing, Weyerhaeuser has not met its burden of proof with regard to the issue of release. Koppers has produced the deposition testimony of several of its employees regarding the care that was taken in Koppers's every day operations. These employees indicated that they had not been aware of any spills or other releases of wood treatment chemicals.[4] Koppers argues, therefore, that any

---

3. Koppers moved for summary judgment on its CERCLA counterclaim. In order to collect under CERCLA, Koppers would need prove the same for things that Weyerhaeuser must: the site is a facility, a release has occurred, proper response costs were incurred, and the defendant is a proper one. Koppers discussed only Weyerhaeuser's status as a CERCLA defendant. As for the other elements, Koppers referred to Weyerhaeuser's motion and arguments and said "if Koppers is liable to Weyerhaeuser, then Weyerhaeuser is liable to Koppers" thus assuming, again, the satisfaction of the other elements.

4. "Q. To your knowledge, was there ever any occasion where creosote or Wolman salt may have entered the ground?
   "A. Not that I know of. You see over where you took on the creosote and all, I told you it was behind that wall and there was never none over in there at all. No other place.... You had it behind the firewall to start with. That's why they had it built up like that....
   "Q. Are you aware of any other type of contamination or pollution to the property, to the soil, from any source whatsoever?
   "A. None that I know of."
   Deposition of Mabry Pouncy (plant manager at Koppers's Baltimore site).

"Q. Did anyone repair the concrete while you were there?
"A. No. As far as I know, as far as I could see, nothing ever happened to it. If it had been leaking out underneath it we wouldn't have had anything to have pumped out. It would have leaked out.
"Q. Would you know how creosote would have gotten underneath that concrete if in fact it's there today?
"A. I don't know. I have no idea...."
*Id.*
"Q. During the time that you were there, were there any ruptures in that creosote pipeline or spills from the rail loading dock area into the working tanks?
"A. Rupture of the line itself?
"Q. Yes, sir.
"A. No, sir.
"Q. Or spills in that area of creosote?
"A. No, sir....
"Q. During the time that you were at the facility from 1946 to 1954, were you aware at any time of spills or leaks of any of the minalith product at any time?
"A. No.
"Q. How about the Wolman products at any time?
"A. No.
"Q. How about the creosote at any time?

release of hazardous substances must not have come from its operations: either the substances were already present before Koppers took over the property or they migrated onto the property from another source.

This Court notes that in support of its own motion for summary judgment, Koppers produced affidavits and testimony seemingly at odds with that referred to above. In order to buttress its argument that Weyerhaeuser was aware of the state of affairs at the wood treatment facility and therefore may not complain about contamination, Koppers has produced the testimony of James Long, a superintendent at Weyerhaeuser in Baltimore, to the effect that "he recognized creosote drippage as an accepted fact in wood treatment operations." Koppers's Summary Judgment, Memo. at 5. Mr. Long's testimony was that the dripping poles were a "hazard of the trade." *Id.*, exhibit 10. Mr. Long also testified that he observed evidence of the creosote on the ground. *Id.*, exhibit 12.

■ This Court holds that as a matter of law, a release of hazardous substances occurred and is attributable to Koppers's operations. First, Weyerhaeuser has conclusively demonstrated the presence of hazardous substances on the property; Weyerhaeuser has also shown that the substances present in the property are used on wood treatment operations. Koppers has not even attempted to rebut these points. Weyerhaeuser has also produced evidence showing that the contamination did not come from a source other than Koppers. The only evidence Koppers has produced in its effort to contradict Weyerhaeuser's proof is the testimony of several of Koppers's employees who deny that any leak or other release occurred. These general denials do not constitute "specific facts showing that there is a genuine issue for trial" as required by Fed.R.Civ.Proc. 56(e). Thus, Koppers has failed to demonstrate a genuine dispute regarding a material fact.

A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. at 2510. "[A] conclusory statement on the ultimate issue does not create a *genuine* issue of fact." *Imperial Tobacco v. Phillip Morris, Inc.,* 899 F.2d 1575, 1581 (Fed. Cir.1990).

> "Neither conclusionary allegations nor general denials perpetuate an issue of fact under Rule 56, and if such undisputed facts effectively pierce the sham of false generality of claims, the case is ripe for summary disposition."

*Johns Hopkins University v. Hutton,* 297 F.Supp. 1165, 1202 (D.Md.1968) (citations omitted); *aff'd in part, rev'd in part* 422 F.2d 1124 (4th Cir.1970). *See U.S. v. Monsanto Co.,* 858 F.2d 160, 170 (4th Cir.1988) (Defendants in CERCLA case protested imposition of summary judgment on liability; they argued that they had presented evidence that all of their waste had been removed from the site prior to clean-up. "[T]he materials on which the generator defendants rely were insufficient to create a genuine issue of material fact. The generator defendants offered only conclusory allegations, principally based 'on information and belief' ...")

The case of *Westwood Pharmaceuticals v. National Fuel Gas Dist. Corp.,* 737 F.Supp. 1272 (W.D.N.Y.1990), while not binding is also instructive on this point. In that case, the district court considered motions for summary judgment on the issue of CERCLA liability. The defendant argued, in part, that it had not "disposed" of hazardous substances. The defendant asserted that the materials which it had left under the surface of the property were sufficiently secure that none of the materials could have escaped into the surrounding area. The court disagreed saying, "that those [hazardous] materials were deposited [by defendant] so that they 'may enter the environment ...' is evident from

---

"A. We had an expansion joint go out next to a working tank one time that we caught and replaced the expansion joint, but not much material was lost. It was just a needle-

thin stream that came through a cast-iron expansion joint."
Deposition of James Robert Brummelt (Plant superintendent for Koppers).

the fact that they *did* enter the environment." 737 F.Supp. at 1278. The court also observed that defendant's evidence on this point was less conclusive than it suggested.

"With regard to the separator pits, the deposition transcript cited by National Fuel merely indicates that "visually they *looked like* they were intact." ... With regard to the pipes, the cited portion of the transcript only indicates that the witness "didn't see holes in them...." This evidence clearly offers too tenuous a foundation upon which to base granting summary judgment in favor of National Fuel ..."

*Id.* at 1278–79.

This Court holds, as previously stated, that a release occurred during the time when Koppers was operating the facility.

**E.** *Compliance with the National Contingency Plan.*

■ The last requirement for CERCLA liability is that "the release [must have] caused the plaintiff to incur response costs that are consistent with the national contingency plan." *Retirement Community Developers, supra,* 713 F.Supp. at 155. Koppers argues that Weyerhaeuser has not

demonstrated that its costs of investigation are in compliance with the national contingency plan [the NCP], and, therefore, Weyerhaeuser's motion must fail.[5] Weyerhaeuser argues that compliance with the NCP is an issue of damages, not liability; alternatively, Weyerhaeuser argues that it need only show that *some* of its costs are in compliance with the NCP in order to establish liability, and that its investigative costs are recoverable under the NCP.

■ Both sides have cited extensive authority in support of their respective positions. This Court finds that the case law supports Weyerhaeuser's alternative position: that the plaintiff need only show that it has incurred *some* cost consistent with the NCP in order to maintain a CERCLA cause of action. So long as Weyerhaeuser has demonstrated that some of its costs are recoverable under CERCLA, it is entitled to judgment on the issue of liability; proof of the consistency of the remaining costs may wait until trial on the issue of damages.

■ At the early stages of a cleanup it is impossible to determine whether all of the costs ultimately incurred will qualify for reimbursement. But cases are frequently litigated before the cleanup is complete. Courts generally have not declined to de-

---

5. Koppers also argues that Weyerhaeuser's costs were not "caused" by the release and are not "necessary." In 1986, Weyerhaeuser entered into a contract with Hobelmann to sell the subject property. Koppers points out that in at least one version of the contract, Hobelmann agreed to take the property "as is." In a later version of the contract, Weyerhaeuser agreed to indemnify Hobelmann for any clean-up costs. Koppers argues that in the first contract Weyerhaeuser had successfully contracted away any CERCLA liability, and that the true "cause" of Weyerhaeuser's costs was *not* the release but actually the later indemnification agreement, Weyerhaeuser's "voluntary assumption" of the responsibility.

This argument is meritless. Although parties may contract away CERCLA liability, the language must be express. At least one court has specifically considered the "as is" language and held that that did not apply to CERCLA liability. *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1000 (D.N.J.1988) ("As is" refers only to warranties of sale, not to the strict liability of CERCLA.). Thus, Weyerhaeuser had not contracted away CERCLA liability only to

unnecessarily assume it again. (Weyerhaeuser asserts that the later indemnification addendum sprang from the fact that Hobelmann would not, if fact, accept the property without the promise of indemnification.)

This Court holds that any costs Weyerhaeuser has incurred were in fact caused by the release of the hazardous substances so that if the other requirements of the statute are met, Weyerhaeuser is entitled to judgment on the issue of liability.

Moreover, these costs are "necessary" as they are in response to a release of hazardous substances as defined by the statute. *See Amoco Oil v. Borden Inc.,* 889 F.2d 664, 670 (5th Cir. 1989) (To be justified, the plaintiff "must necessarily have acted to contain a release threatening the public health or the environment," and this is demonstrated by showing that the release violates a statutory standard, as Weyerhaeuser has demonstrated here.) Nor is it necessary for the government (state of federal) to have ordered or required the clean-up. This is clear both from the statute and from the case law. *See Richland–Lexington Airport District v. Atlas Properties, Inc.,* 901 F.2d 1206, 1208–9 (4th Cir. 1990).

termine liability where a cleanup is incomplete; they have required, however, that the plaintiff show that at least some costs incurred are in compliance and thus recoverable.

This holding was explicitly stated by the Ninth Circuit in *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1154 (9th Cir.1989):

> "Requiring a CERCLA claimant to plead a cognizable response will assist in the proper processing of these actions. There has been extensive litigation over which types of response cost are recoverable in a section 107(a) action.... Without passing on what precisely qualifies as a 'response cost' under CERCLA, we observe that if a plaintiff ultimately fails to show a proper response cost, then he will fail to prove his prima facie case.... It therefore makes sense to impose as a pleading requirement that a claimant must allege at least one type of response cost cognizable under CERCLA in order to make out a prima facie case."

(citations omitted).

■ In *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667 (5th Cir.1989), the Fifth Circuit noted that in many CERCLA cases, the issues of liability and damages are often handled separately.

> "[D]isputed factual and legal issues pertaining only to liability are resolved before deciding the more complicated and technical questions of appropriate cleanup measures and the proportionate fault of the parties."

*Id.* The Court listed the prima facie elements of liability as has been listed before, including the incurrence of response costs consistent with the NCP. If the plaintiff has proven these elements, it is entitled to summary judgment "even when 'there is a genuine issue as to appropriate damages.'" *Id.* at 668. Only after liability is established does the court go on to consider which of plaintiff's costs are recoverable. *Id.* Clearly, plaintiff need not have shown that all its costs are consistent with the NCP in order to obtain judgment of liability. *See also T & E Industries, Inc. v. Safety Light Corp.,* 680 F.Supp. 696

(D.N.J.1988) and *Southland Corp., supra,* 696 F.Supp. at 999.

The cases cited in support of Koppers's proposition generally were decided based on an detailed record, and presumably for this reason, the courts concluded that there was no need to defer the determination of costs. The courts did not, however, explicitly rule that in the absence of a complete record the complaint would have been dismissed.

■ This Court holds that in order to prove a prima facie case of CERCLA liability, the plaintiff must prove that it has incurred at least some costs which are in compliance and hence recoverable. If the plaintiff has done so, it is entitled to judgment as to liability. Determination of damages will then await complete development of the record.

The National Contingency Plan sets forth detailed guidelines with which the parties must comply in order to collect the costs of a clean up of hazardous waste. *See* 42 U.S.C. § 9607(a)(4)(B). The guidelines are designed to insure that prompt, cost efficient and safe procedures are utilized. They are also intended to insure that the public has access to the plan of action which the party taking the action is following. The bulk of the NCP guidelines appear to apply to actual removal and remedial procedures but do not logically appear applicable to the initial assessment aspects of a cleanup.

■ However, CERCLA defines "response" as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Remove" or "removal" includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). Thus, testing for hazardous material qualifies as a "removal" cost under the statute.

The courts which have considered this issue have recognized this fact, and these courts have held that investigative costs, such as those incurred by Weyerhaeuser in this case, are recoverable response costs consistent with the NCP. *See Ascon Prop-*

*erties, supra; Amoco Oil, supra; South-land Corp., supra.* There is no reason to hold differently in this case.

### F. *Conclusion.*

■ Because Weyerhaeuser has demonstrated that the subject property is a "facility," that Koppers is a proper defendant, that a "release" occurred, and that Weyerhaeuser has incurred some response costs consistent with the National Contingency Plan, Weyerhaeuser is entitled to judgment in its favor in the issue of Koppers's CERCLA liability.[6]

### IV. KOPPERS'S MOTION

### A. *Koppers's CERCLA Liability.*

Koppers has moved for judgment that it is not liable to Weyerhaeuser under the provisions of CERCLA. For the reasons discussed above, the requested judgment will be denied.

### B. *Koppers's State–Law Liability.*

■ In addition to its CERCLA claim against Koppers, Weyerhaeuser also asserted a number of claims based on state causes of action. Koppers has moved for summary judgment on these claims for a variety of reasons, the foremost of which is the running of the statute of limitations. The Maryland statute of limitations applicable to these causes of action is three years. Md. Courts and Jud.Proc.Code Ann. § 5–101.

In 1984, the State of Maryland included the property at issue on a list of sites which potentially contained controlled hazardous substances. This list was published in the *Maryland Register* on August 31, 1984. The State did not indicate that these sites in fact contained hazardous materials, and admitted that it was "entirely possible" that some of the sites were not contaminated. The obvious implication was that further investigation was warranted.

The State continued to include this property on the list of contaminated sites when the list was republished later in 1984, and in 1985 and 1986. Weyerhaeuser did nothing, however, until 1986 when, in view of the impending sale of the property, investigative environmental studies were performed. In November of 1986, Weyerhaeuser received conclusive word that the property was in fact contaminated.

This case was filed in February, 1989. Koppers asserts that Weyerhaeuser's cause of action accrued more than three years before that date. Weyerhaeuser argues that its cause of action did not accrue until November, 1986 when it was put on actual notice of the contamination of the property.

Contrary to Weyerhaeuser's assertion, it is not the date of its actual knowledge that is relevant. The discovery rule governs the time of accrual of a cause of action under Maryland law. The cause of action accrues at the time the plaintiff had actual knowledge *or* implied knowledge of the existence of the cause of action. *Wagner v. Allied Chemical Corp.,* 623 F.Supp. 1407 (D.Md. 1985) (citing *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981)). Implied knowledge springs from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [such that plaintiff is charged] with notice of all facts which such an investigations would in all probability have disclosed if it had been properly pursued." *Poffenberger, supra,* 290 Md. at 637, 431 A.2d 677.

The Court in *Wagner, supra,* did say that plaintiffs' cause of action did not accrue until the time when they had been specifically informed by their doctors that their injuries were probably related to their working environment. This holding, however, was based on the peculiar nature of the sufferings and the fact that plaintiffs had no other means of discovering the con-

---

6. Both parties have extensively discussed the relative roles of Weyerhaeuser and Koppers in running the wood treatment facility. Koppers argued that liability cannot be determined without also determining the scope of liability. This is putting the cart before the horse. First, this Court must determine whether, under the statute, Koppers is liable at all. It has done so. The issue now remaining is the scope of that liability.

*See* discussion below, part IV, C.

nection. In fact, the Court did dismiss the claims of another group of plaintiffs on the grounds that they had been put on notice of the connection even though they had never been specifically informed of its existence.

Weyerhaeuser knew or should have known of the contamination back in 1984. In that year, the list of potentially contaminated sites was published. Had Weyerhaeuser properly pursued an inquiry into the actual state of the property, it would have discovered the contamination of which it now complains. Instead, Weyerhaeuser waited two more years to even begin investigation. Accordingly, Weyerhaeuser's claims are barred because its cause of action accrued more than three years before this action was filed.

#### C. *Weyerhaeuser's CERCLA Liability.*

■ Koppers has asserted a CERCLA counterclaim against Weyerhaeuser as an owner/operator of the facility at issue. This Court has already determined that the property is a facility and that a release occurred. Koppers asserts that, like Weyerhaeuser, it has incurred recoverable investigative costs, and Weyerhaeuser has not disputed this. Koppers also asserts that as an owner of the facility, Weyerhaeuser is a proper defendant.

Clearly, Weyerhaeuser is liable under the strict terms of CERCLA: Weyerhaeuser is an owner of a facility at which a release occurred and caused the incurrence of response costs. Koppers is entitled to judgment on this issue.

Weyerhaeuser argues that liability under CERCLA may be either joint and several or apportioned, and that in this case apportionment is appropriate. Weyerhaeuser urges this Court to find that its actions in no way contributed to the contamination and to hold that the CERCLA liability should therefore be apportioned to fall on Koppers. Koppers argues that Weyerhaeuser was involved in the operation of the wood treatment facility and that apportionment is inappropriate or at this point premature.

In *U.S. v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), the Fourth Circuit endorsed a general application of joint and several liability under CERCLA. Apportionment is possible only where "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." 858 F.2d at 172. The defendant (or counter-defendant, here) bears the burden of establishing a reasonable basis for apportioning the liability. *Id.*

The Court also distinguished between considerations of divisibility relevant to the issue of joint and several liability (versus apportionment) and equitable factors, such as a defendant's limited involvement with waste disposal activities, which are relevant to actions for contribution. 858 F.2d at 171, n. 22. The Court affirmed the imposition of joint and several liability upon all defendants, the owners and generators alike. The Court also held that the equitable considerations such as knowledge and degree of involvement would be considered in a later action for cost allocation. 858 F.2d at 173.[7]

The harm in this case is clearly indivisible: the contamination is the result of the operation of the wood treatment facility. At this point, Weyerhaeuser has failed to make a conclusive showing that there is a reasonable basis for determining the relative contributions of each party to this single harm. Weyerhaeuser and Koppers still bitterly dispute the extent of Weyerhaeuser's involvement with the operation of the facility; clearly disposition of the issues of apportionment or allocation would be premature on these motions for summary judgment.

7. *Monsanto* was a case brought by the state and federal governments against various defendants (owners, operators, generators) to recover the governments' costs of clean-up. The Court was primarily concerned with making the government whole; therefore, cost allocation could wait till a later date. It is important to note, however, the line which the Court drew between divisibility issues relevant to the scope of liability and equitable factors relevant to allocation of damages.

Koppers is entitled to judgment that Weyerhaeuser is liable to it under CERCLA. Whether this liability is apportionable or joint and several can be better defined by this Court after further hearing. Similarly, a decision as to the proper allocation of damages would be premature at this point. Accordingly, no decision on these issues will be forthcoming absent further development of the record or some new instruction from the Fourth Circuit.

## V. CONCLUSION AND ORDER

For the reasons set forth in the accompanying memorandum, it is this 1st day of February, 1991, by the United States District Court for the District of Maryland,

ORDERED:

1. That Weyerhaeuser's motion for partial summary judgment on the issue of CERCLA liability is GRANTED;

2. That Koppers is declared to be liable to Weyerhaeuser in accordance with the provisions of CERCLA;

3. That Koppers motion for summary judgment is GRANTED IN PART AND DENIED IN PART;

4. That judgment is entered in favor of Koppers on Weyerhaeuser's state law claims (Counts 2 through 7);

5. That Weyerhaeuser is declared to be liable to Koppers in accordance with the provisions of CERCLA;

6. That issues remain regarding the apportionability of liability and allocation of damages which are not susceptible to summary judgment; and accordingly, these issues are reserved for further consideration.

## ON MOTION FOR RECONSIDERATION

### I. *Introduction*

This case involves environmental contamination at a site which has been identified in pleadings as 2901 Childs Street. Plaintiff Weyerhaeuser brought suit against defendant Koppers asserting claims based on CERCLA (42 U.S.C. § 9607) and various theories of state law. On February 1, 1991 this Court granted defendant Koppers Company's motion for summary judgment

in its favor on plaintiff Weyerhaeuser's state-law claims. This Court held that Weyerhaeuser's state claims were barred by the three-year statute of limitations: Weyerhaeuser's cause of action accrued in 1984 when it was put on constructive notice of the contamination of the property via a notice published in the *Maryland Register* and over three years passed before this action was filed in February, 1989.

Pending before the Court is Weyerhaeuser's motion for reconsideration of this ruling. Weyerhaeuser argues that the 1984 notice in the *Maryland Register* did not refer to the property or to Weyerhaeuser on its face and that this notice was not intended to refer to the property which is the subject of the present suit. Koppers has opposed this motion arguing first that the 1984 notice did in fact refer to the subject property, that at worst it was ambiguous and should have caused Weyerhaeuser to inquire further, and last that Weyerhaeuser should have brought any ambiguity to the Court's attention when opposing the summary judgment motion and that argument at this point is untimely.

### II. *Background Facts*

In August of 1984, the State of Maryland compiled a list of sites which potentially contained controlled hazardous substances. This list was published in the August 31, 1984 *Maryland Register.* The reference which is at issue in this case read:

"KOPPERS CO
Baltimore Treating Plt
Childs St and Frankchilds Ave
Baltimore, MD 21226
Baltimore City"

In April, 1986 the *Maryland Register* again referred to Koppers's Baltimore operations, as follows:

"SECTION IV
PRELIMINARY ASSESSMENTS COMPLETED PRIOR TO THE PUBLICATION OF THE MASTER LIST OF POTENTIAL HAZARDOUS WASTE SITES
[ ...]
**Koppers Company—Baltimore Treating Plant**
**Childs Street and Frankfurst Avenue**

**Baltimore, Maryland 21226 (Baltimore City)**

A. The site consists of approximately four (4) acres of State and privately owned land north of Frankfurst Avenue and west of Childs Street. Directly north of the site is the Patapsco River, to which the groundwaters flow. Part of this property off of Childs Street was being utilized as storage for new Datsun automobiles and is enclosed by a fence. The remaining land is owned by the State of Maryland.

B. Koppers Company operated a lumber treatment facility on-site from 1950–1972. Wood was treated with chromated copper arsenate (CCA) and creosote resulting in creosote and CCA sludges, and creosote process wastewater. During the company's operation, these wastes were disposed of on-site by landfill method in the area now covered by a parking lot.

A pile of approximately 15,000 cubic yards of flyash exists on-site, as well as considerable amounts of trash, old furniture, tires, and old appliances. The roadside dumping is not connected with Koppers Company, however.

C. For further examination, a site investigation with the appropriate sampling is recommended."

Weyerhaeuser points out that the August, 1984 notice nowhere refers to Weyerhaeuser by name nor does it reference a site known as 2901 Childs Street. Weyerhaeuser argues that in fact the 1984 notice did not refer to Weyerhaeuser's property at 2901 Childs Street: 2901 is on the east side of Childs Street[1] and is not at the intersection of Frankchilds Avenue and Childs Street. Weyerhaeuser has produced copies of correspondence between it and environmental officials and between state and federal officials which demonstrate that there was some confusion regarding which parcel the 1984 notice was referring to.[2] Weyerhaeuser has also produced an affidavit prepared for the purposes of its motion in which an employee of the Maryland Department of the Environment ("MDE") opines that the property referred to in the 1984 notice is not the same property which is the subject matter of this suit.

Koppers admits that the 1984 notice in the *Maryland Register* was ambiguous: it does not identify on which side of Childs Street or on which side of the Childs Street and Frankchilds Avenue intersection the referenced property lies. Koppers points out, however, that the notice specifically referred to the "Baltimore Treating Plant," and Weyerhaeuser was admittedly aware that it had been leasing property to Koppers for use as a wood treatment plant since the 1940's. Koppers has also submitted the affidavit of its real estate manager who states that the property leased by Koppers from Weyerhaeuser was never identified by an address in the lease documents but always by a metes and bounds description. This supports Koppers's argument that a specific reference to 2901 Childs Street was not necessary: in previous pleadings Weyerhaeuser has seemed to understand the 1986 notice as referring to the leased property, and no street address was contained there.[3] Lastly, Koppers asserts that Weyerhaeuser and its counsel were aware of ambiguities in the notice and confusion on the part of government officials back in October, 1990. As Weyerhaeuser refrained from submitting this information to the Court in its December 21

---

**1.** According to Weyerhaeuser, the property referred to in the notice lies on the west side of Childs Street.

**2.** Weyerhaeuser met with state officials in October of 1990. At that time Weyerhaeuser was given copies of 1986 correspondence between the state's DHMH and the federal EPA. As discussed in this Court's February 1, 1991 Memorandum and Order, Weyerhaeuser did not investigate the condition of its property until time came to sell to a third party.

**3.** In its motion for reconsideration, Weyerhaeuser states that the property referred to in the 1986 notice is not the property at 2901 Childs Street. In previous pleadings, Weyerhaeuser has regarded this 1986 notice as referring to the property which is the subject matter of this suit. This issue is of limited relevance because Weyerhaeuser did file suit within three years of the 1986 notice.

response to Koppers's November 19 motion for summary judgment, Weyerhaeuser may not now assert this argument as grounds for reconsideration.

## III. *Applicable Law and Analysis*

### A. *Rule 59(e) Motions*

■ A motion for reconsideration (or, to alter or amend judgment) made pursuant to Fed.R.Civ.P. 59(e) may be made for one of three reasons: (1) an intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice. *Natural Resources Defense Council v. U.S. E.P.A.*, 705 F.Supp. 698, 702 (D.D.C.1989), *vacated on other grounds* 707 F.Supp. 3 (D.D.C.1989). Such a motion is not to be made lightly. A Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the [summary] judgment issued." *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). Nor can the motion be used to submit evidence which should have been submitted before. *See Jensen v. Conrad*, 570 F.Supp. 114, 128–29 (D.S.C.1983) ( [S]ummary judgement will generally not be altered or vacated on the basis of supplemental exhibits or affidavits filed after summary judgment is granted.... This is particularly true in a case such as this where the party seeking to amend judgment has made absolutely no showing that the additional evidence offered could not have been timely submitted in the exercise of reasonable diligence.")

Weyerhaeuser learned in October of 1990 that there was some confusion on the part of state environmental officials regarding which property had been referenced by the 1984 notice in the *Maryland Register*. Apparently in 1986 the state realized that there were potentially two parcels of land involved. At that point, the state wrote a letter to the federal EPA requesting clarification (whether the two parcels should be treated separately or as one for the purposes of evaluation). The record does not reflect whether any clarification was received.

Weyerhaeuser elected not to place this information before the Court in Weyerhaeuser's opposition to Koppers's motion for summary judgment. Counsel have stated that they did not think it necessary because they believed this Court would deny Koppers's motion as the 1984 notice on its face did not refer to Weyerhaeuser or 2901 Childs Street.[4] Weyerhaeuser incorrectly anticipated this Court's decision; that is not grounds for permitting Weyerhaeuser to come now with arguments and evidence which would have been more appropriately presented before. *See Natural Resources Defense Council*, 705 F.Supp. at 702 n. 3 (Defendant's failure to proffer affidavit at summary judgment "is a strategic decision for which [defendant] bears responsibility." *Citing Frito–Lay of Puerto Rico, Inc. v. Canas*, 92 F.R.D. 384, 391 (D.P.R.1981)).

### B. *Constructive Notice*

■ Even had Weyerhaeuser offered this information before, however, this Court is not persuaded that the resulting decision would have been different. The issue determined on summary judgment was when Weyerhaeuser's cause of action accrued. Under Maryland law, a cause of action accrues when the plaintiff had actual *or* implied knowledge of its existence. *Wagner v. Allied Chemical Corp.*, 623 F.Supp. 1407 (D.Md.1985) Knowledge sufficient to accrue a cause of action will be implied when plaintiff has "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry ..." *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677 (1981).

Weyerhaeuser did not begin its inquiry until 1986; tests performed then clearly demonstrated the presence of environmental contaminates. Had these tests been performed in 1984, the results would presumably have been the same. The question, therefore, is whether the 1984 notice in the *Maryland Register* should have

---

**4.** *See* discussion part B below.

caused Weyerhaeuser to make these investigations.

The Court realizes that the 1984 notice was ambiguous. It did not purport to conclusively identify contaminated properties but stated only that the listed sites were "potentially" contaminated. Nor was its identification of location as clear as could be desired; the 1984 notice was brief and to the point: the site of Koppers's Baltimore Treatment Plant was a site of potential contamination.

 This identification, ambiguous as it was, should at least have caused Weyerhaeuser to inquire further into the situation. Weyerhaeuser knew that it had leased property to Koppers for some thirty years and that the leased property was specifically to be used as Koppers's Baltimore wood treatment plant. Although both Weyerhaeuser and Koppers have disputed the closeness of their relation in operating the wood treatment facility, it is clear that Weyerhaeuser was sufficiently acquainted with the existence of the operation to have been put on constructive notice by the 1984 listing. Particularly as the lease on the subject property had been allowed to expire, and the property had been returned to Weyerhaeuser and then leased to a third party, Weyerhaeuser should not be entitled to assume that if the notice indeed referred to the subject property, it would have no responsibility for response.

The Court would not find that the 1984 notice in the *Maryland Register* did or did not refer to the property which has been identified as 2901 Childs Street. The Court would find that the 1984 was sufficient in identifying a "Koppers Company; Baltimore Treatment Plant" such that Weyerhaeuser had a burden of further inquiry.[5] Accordingly, this Court would stand by its previous determination that Weyerhaeu-

ser's cause of action accrued in 1984 and that Weyerhaeuser's state law claims are therefore barred by the statute of limitations.

### IV. *Conclusion and Order*

The argument contained in Weyerhaeuser's motion for reconsideration should have been made in opposition to Koppers's motion for summary judgment; therefore, this Court holds that it is untimely made. Even considering Weyerhaeuser's points, this Court would hold that Weyerhaeuser was put on notice of its cause of action in 1984 and that suit on its state law claims is therefore barred.

Accordingly, it is this 26th day of February, 1991 by the United States District Court for the District of Maryland,

ORDERED:

That plaintiff Weyerhaeuser's motion for reconsideration is DENIED.

---

5. Had Weyerhaeuser inquired and the state responded that the notice did not refer to the facility at 2901 Childs Street, this Court might be faced with a different situation. Weyerhaeuser did not inquire, however. This Court feels that opinions given by the state in 1990 or 1991 as to the meaning of a notice published in 1984 are not relevant to the issue of whether Weyer-

haeuser should have investigated further. Moreover, the confusion evidenced by the government officials over the meaning of their own notice tends to undermine Weyerhaeuser's argument that the notice clearly did not (nor was intended to) refer to the property at 2901 Childs Street.