THE SHERWIN–WILLIAMS COMPANY, Plaintiff,

v.

ARTRA GROUP, INC., et al. Defendants

No. CIV. A. S91–2744.

United States District Court, D. Maryland.

Jan. 12, 2001.

Randall M. Lutz, Hodes, Ulman, et al, Towson, MD, Allen J. Danzig, Law Office, Cleveland, OH, Christopher W. Poverman, Hodes, Ulman, Pessin & Katz, Towson, MD, Natalie Paige Drinkard, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, for Plaintiff.

Kathleen Howard Meredith, Ilif & Meredith, P.C., Robert E. Scott, Jr., Semmes, Bowen & Semmes, Robert Brooke Hopkins, George Whitthorne Kelly, Ober, Kaler, Grimes & Shriver, Baltimore, MD, Ja-

son C. Buckel, McGuire, Woods, Battle & Boothe LLP, Richmond, VA, Richard J. Magid, Whiteford, Taylor & Preston, Baltimore, MD, Frank J. Mastro, Law Office, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

SMALKIN, District Judge.

The plaintiff, Sherwin–Williams Company ("SW"), filed a complaint against defendants, ARTRA Group, Inc. ("ARTRA"), et al., asserting claims against ARTRA and other former owners and operators of a contaminated property in an industrial area south of Baltimore, Maryland. Specifically, the plaintiff alleges that the defendants' activities on the property caused the release of hazardous and toxic chemicals that contaminated the soils and groundwater at the property. In its eight-count Complaint, the plaintiff seeks cost recovery, contribution, and declaratory relief pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Sections 9607(a), 9613(f), and 9613(g)(2) (Counts I–III). In addition, SW asserts claims for common law indemnification, common law contribution, contract indemnification, negligence, and nuisance. This case was stayed for a number of years, on the parties' request, pending certain administrative proceedings, which have now been concluded.

The case is before the Court on numerous motions from the plaintiff, SW, and the defendant, ARTRA. SW filed a motion for partial summary judgment on Counts I–III (the CERCLA claims), and Count VI (for contract indemnification). ARTRA filed five motions with the Court. These included: (1) a motion for judgment on the pleadings with respect to Counts I (CERCLA cost recovery), IV–V (common law indemnification and common law contribution), and counts VII–VIII (negli-

gence and nuisance); (2) a motion for partial summary judgment as to Count VI (contractual indemnification); (3) a motion for partial summary judgment on Counts I–III, alleging that those claims are time-barred; (4) a motion for partial summary judgment as to drum removal costs and costs associated with the so-called 200, 600, and 700 Areas; and (5) a motion for summary judgment regarding SW's alleged failure to comply with the National Contingency Plan. The Court has considered the pleadings submitted by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

For clarity, the Court will rule with respect to each Count of the initial Complaint. As to Count I (CERCLA cost recovery), SW's motion for partial summary judgment is DENIED, and ARTRA's motion for judgment on the pleadings is GRANTED.[1] As to Count II (CERCLA contribution), SW's motion for partial summary judgment is GRANTED, and ARTRA's motion for partial summary judgment is DENIED. As to Count III (declaratory judgment), SW's motion for partial summary judgment is GRANTED, and ARTRA's motion for partial summary judgment is DENIED. As to Count IV (common law indemnification), ARTRA's motion for judgment on the pleadings is GRANTED. As to Count V (common law contribution), ARTRA's motion for judgment on the pleadings is GRANTED. As to Count VI (contract indemnification), SW's motion for partial summary judgment is GRANTED with respect to those costs incurred within the limitations period, and ARTRA's motion for partial summary judgment is DENIED, except that it is GRANTED to the extent that claims falling outside the statute of limitations are barred. As to Counts VII and VIII (negligence and nuisance), ARTRA's motion for judgment on the pleadings is GRANTED. Finally, ARTRA's motion

---

1. Because the Court has granted ARTRA's motion for judgment on the pleadings on this issue, its motion for partial summary judgment on grounds that the claim is time barred need not be considered.

for summary judgment on the issue of SW's alleged failure to comply with the National Contingency Plan is DENIED, and ARTRA's motion for partial summary judgment as to drum removal costs and the 200, 600 and 700 areas is DENIED.

## BACKGROUND

This case involves a dispute about who is responsible for paying for the cleanup of hazardous substances contaminating a 23–acre parcel of land located on Hollins Ferry Road in Baltimore, Maryland. The site has been used by various owners since the late 1940s for paint manufacturing. The defendant, now known as ARTRA, became an owner of the site through a series of mergers and corporate name changes beginning in approximately 1962. In 1980, ARTRA (which at the time was known as Dutch Boy) signed an agreement to sell its assets, including the subject property, to Sherwin–Williams, the current owner of the property. The sale agreement signed by the parties contains an assumption of liabilities clause.

During ARTRA's ownership of the property, hazardous substances were used and hazardous waste was generated, including toluene, xylene, methylene chloride (varnish remover), and trichloroethylene (TCE) waste that was shipped from the property as indicated by waste manifests from 1979 and a 1979 Waste Generation Study. These substances were primarily used as solvents. SW's expert, whose conclusions have been questioned by ARTRA's expert, determined that a large portion of the contamination on the property was caused by leaks from underground storage tanks (USTs) that began during ARTRA's ownership. These tanks were removed during SW's ownership and, at that time, there was evidence that several of the tanks contained holes and were leaking. An analysis of photographs taken during ARTRA's ownership shows open storage of drums, and "[e]vidence of what may be a recent flow of liquid(s)" in an area near one of the buildings at the site.

The deposition testimony of several former Dutch Boy (now ARTRA) employees indicates that there was a leak in an underground storage tank, pipeline leaks, and leaking drums. Specifically, the employees stated that the contents of drums (including traffic paint and industrial finishes) sometimes spilled when palettes would break or forklifts would accidentally puncture them, splashing would occur when drums were filled with product, and pits dug in the ground were used to drain solvent wastewater from drums. According to the employees, these drums and tanks contained hazardous substances such as xylene, toluene, methylene chloride and other substances that have been found on the site. A spill prevention plan dated November 15, 1973 noted that "[t]here have been no spills greater than a few hundred gallons outside of buildings during the last 3 years" and "only one tank failure in the 25 years [*sic*] plant history."

Sherwin–Williams used many of the same chemicals in its paint manufacturing processes, including trichloroethane (TCA), toluene, methyl ethyl keytone (MEK), and methyl isobutyl keytone (MIBK). In the early 1980s, after SW took over ownership of the property, officials from the State Department of Health and Mental Hygiene, Environmental Health Administration (now Maryland Department of the Environment (MDE)) began to direct SW to clean up contamination at the site. Drum removal was ordered by the State in 1984 after a finding that SW was in violation of state law regarding the proper storage and removal of waste drums. On January 29, 1985, SW entered into a Consent Order with MDE in which SW was ordered to construct a drum storage pad, install monitoring wells, and pay a fine. In May 1985, the State brought an action against SW for the unpermitted discharge of water pollutants and controlled hazardous substances. The case was settled in 1986, and SW was ordered to pay a fine and to conduct environmental improvements at the facility. The State also

ordered the removal of underground storage tanks (1986), and the excavation of contaminated soils (1988). In 1985–86, and from 1989–90, environmental consultants conducted site investigations at the direction of the State. According to assessments of monitoring data, methyl chloride, toluene, xylene, methyl ethyl keytone (MEK), methyl isobutyl keytone (MIBK), benzene, trichloroethylene (TCE), and trichloroethane (TCA) were detected in the soil and groundwater at the site. In 1990 the site was divided into five areas—the 100 Area, the 200 Area, the 300 Area, the 400 Area, and the 500 Area. Later, Areas 600 and 700 were designated. Monitoring, sampling, and hydrogeologic investigation work continued throughout this period, at the direction of the State. After suit was filed, and between 1992 and 1994, SW consultants conducted a pre-remedial design investigation required by the State. A "Technical Evaluation of Alternatives for Remediation of Area 200" was drafted in November of 1993, and a legal notice was placed in *The Baltimore Sun* on November 7, 1993, notifying the public of the opportunity to comment. Remediation began in the 200 Area in 1994. The same procedure was followed for the remediation of the 100/500 Area—a report was drafted and notice was placed in *The Baltimore Sun* on June 21–23, 1996, providing the opportunity for public comment. Remediation began on the 100/500 Area in late 1996–early 1997.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

### Count I—CERCLA Cost Recovery

In this Count, SW seeks to recover cleanup costs under CERCLA from former owners (ARTRA) of the site it now owns. CERCLA provides a method whereby a private party who responds to contamination at a facility covered by CERCLA can recover response costs from responsible parties. *See* 42 U.S.C. § 9607. There are, however, limitations on the use of this cost recovery device by parties who are themselves potentially responsible for pollution on the site. The Fourth Circuit has made clear that a party who is a potentially responsible party (PRP) cannot sue for cost recovery. Rather, such party's method of cost recovery should be an action for contribution. In *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409 (4th Cir.1999), the court concluded

that "[e]very circuit that has addressed the question, including this one, has held that parties ... who are potentially responsible for cleanup costs under § 107 cannot bring § 107 cost recovery actions; rather, such parties 'must seek contribution' under § 113." *Id.* at 415.

As a current owner and operator of the site where hazardous substances have been released, SW is itself a potentially responsible party (PRP), even if SW did not own the property at the time the hazardous waste disposal occurred. *See* 42 U.S.C. § 9607(a)(1); *Trinity American Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998); *see also Axel Johnson*, 191 F.3d at 413; *Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 386 (4th Cir.1999). Furthermore, SW would have to prove that it is "truly innocent of *any* pollution" in order to take advantage of the innocent party exception, which allows a plaintiff to pursue a cost recovery action despite its status as a PRP. *Axel Johnson*, 191 F.3d at 416 (emphasis in original). It can hardly be said on this record that Sherwin–Williams is innocent of any pollution. SW was subject to numerous state enforcement efforts in which the State documented spills and leaks in the early 1980s during SW's ownership. In addition, SW's own evidence demonstrates that xylene releases occurred at the site in February of 1988 and October of 1994, both during its ownership. *See* SW's Appendix Volume III, Tab 21 at 14086; SW's Opp'n to ARTRA's Motion at 22. Therefore, SW may not bring an action for cost recovery under § 107, and must instead rely on its claim for contribution under CERCLA to recover costs from ARTRA. Accordingly, SW's motion for partial summary judgment must be denied, and ARTRA's motion for judgment on the pleadings must be granted, as to Count I.

Count II—CERCLA Contribution

In this Count, SW seeks contribution from ARTRA under CERCLA, 42 U.S.C. § 9613(f)(1). This section of the statute provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, ...." 42 U.S.C. § 9613(f)(1). Therefore, SW is entitled to seek contribution from ARTRA if ARTRA is a potentially responsible party under Section 9607(a).

*Statute of Limitations*

■ SW filed its complaint in this action on September 23, 1991 for the recovery of cleanup costs it began to incur in the early to mid 1980s. ARTRA argues that SW's CERCLA contribution claim is barred by the statute of limitations. CERCLA was amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) to include, among other things, a statute of limitations which became effective on October 17, 1986. 42 U.S.C. § 9613(g). The provision provides a statute of limitations to be applied to initial actions for recovery of costs under § 107 and a statute of limitations that applies to contribution actions under § 113(f). Section 113(g)(3), the section applicable to contribution actions, provides that:

> [n]o action for contribution ... may be commenced more than 3 years after— (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages. 42 U.S.C. § 9613(g)(3).

SW began to incur response costs in 1984 when the State requested that it remove drums from the property, and in 1985, in response to a consent order it signed with the State Department of Health and Mental Hygiene, Environmental Health Administration (now the Maryland Department of the Environment) requiring it to build a drum storage pad by March 1, 1985, and to conduct a survey and study for the placement of groundwater monitoring wells. SW did not incur costs in re-

sponse to any of the triggering events provided in the statute of limitations for contribution actions in Section 113(g)(3).

The Tenth Circuit, faced directly with the question of what statute of limitations to apply to an action for contribution under CERCLA when none of the triggering events listed in § 113(g)(3) has occurred, concluded that the statute of limitations for initial cost recovery actions found in § 113(g)(2) should apply. *See Sun Co., Inc. v. Browning–Ferris, Inc.*, 124 F.3d 1187, 1192 (10th Cir.1997). That court determined that a contribution action "is, by definition, an action for recovery of the *costs referred to* in § 107," and therefore, in the absence of the occurrence of one of the triggering events, the statute of limitations applied to initial actions for recovery of costs should apply. *Id.* Therefore, "[i]f the PRP incurred its cleanup costs in some other way, without the attendant procedural safeguards of a judgment or CERCLA settlement, its contribution action will be the initial action for recovery of such costs." *Id.* at 1193. The Sixth Circuit has cited this approach with approval in support of the conclusion that PRPs are limited to actions for contribution. *See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 355 (6th Cir.1998) ("While we need not adopt the Tenth Circuit's reasoning because a statute of limitations issue is not before our court today, we note that our resolution of this case in finding that § 113 is not completely independent of § 107 would render a similar result."); *see also Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 809 (N.D.Cal. 1999) (adopting the Tenth Circuit's approach in *Sun* and applying the statute of limitations in 113(g)(2) to contributions actions where none of the triggering events have occurred). To be sure, there are decisions that have refused to borrow a statute of limitations when none of the triggering events in § 113(g)(3) has occurred. *See Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F.Supp. 1116, 1125 (N.D.Fla.1995); *Rumpke of Indiana, Inc.*

*v. Cummins Engine Co.*, 107 F.3d 1235, 1241 (7th Cir.1997) (suggesting that a contribution claim should not accrue until one of the triggering events occurs). The Fourth Circuit has yet to address the issue of which statute of limitations should apply to an action for contribution when none of the triggering events have occurred. However, in view of the Fourth Circuit's decision in *Axel Johnson, supra*, in which the court recognized the interplay between Sections 107 and 113 and held that a PRP may only bring an action for contribution, this Court is of the view that if this question were before the Fourth Circuit, it would agree with the Tenth Circuit's view that the statute of limitations should be borrowed from § 113(g)(2) in situations, like this one, where a PRP has incurred cleanup costs but has not been subject to a judgment or CERCLA settlement. Thus, this Court will borrow the subsection (g)(2) limitations provision.

Section 113(g)(2) provides that:

[a]n initial action for the recovery of the costs referred to in section 9607 of this title must be commenced—(A) for a *removal action*, within 3 years after completion of the removal action . . . . and (B) for a *remedial action*, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered . . . . (Emphasis supplied). 42 U.S.C. § 9613(g)(2).

Therefore, in order to determine both the date on which the cause of action accrued and the correct period of limitations to apply, this Court must determine whether the actions taken by SW were removal or remedial actions.

■ As an initial matter, however, the earliest date that the cause of action could have accrued is October 17, 1986, which is the effective date of the CERCLA statute of limitations, because the statute should

not be applied retroactively to claims that existed prior to its enactment. *See United States v. Fairchild Indus., Inc.,* 766 F.Supp. 405, 415 (D.Md.1991); *Velsicol Chemical Corp. v. Enenco, Inc.,* 9 F.3d 524, 528–29 (6th Cir.1993); *United States v. Moore,* 698 F.Supp. 622, 625–27 (E.D.Va.1988). Therefore, any response actions taken prior to that date do not trigger the running of the statute of limitations. This means that SW's drum removal in 1984 and its construction of the drum storage pad and the installation of monitoring wells in 1985 do not trigger the statute of limitations. Moreover, even if the statute was to be applied to these actions retroactively, the actions would be classified as the initial *removal* actions which took place at the site, and not, as the defendant suggests, as the initiation of physical on-site construction of a remedial action.[2] Therefore, the classification of the remaining actions taken by SW is important—if any of the actions were remedial actions, the period of time between the earliest accrual date, October 17, 1986, and the date the suit was filed, September 23, 1991, is a little less than five years, and therefore SW's action would not be barred by the 6–year of statute of limitations for remedial actions. On the other hand, if the actions are removal actions, then in order for the statute of limitations to bar the claim, the removal activities must have been completed before September 23, 1988 (a date three years before this suit was filed), *and* there must have been no initiation of a remedial action within three years after the completion of the removal action. *See* 42 U.S.C. § 9613(g)(2)(B). Otherwise, SW's CERCLA contribution claim would not be time barred.

Removal actions are generally short-term actions taken to "cleanup or remov[e] released hazardous substances from the environment ...", 42 U.S.C. § 9601(23), including actions to "monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment ....," while remedial actions are "those actions consistent with permanent remedy taken instead of or in addition to removal actions ...." 42 U.S.C. § 9601(24).

■ ARTRA admits that SW took removal actions through at least February 1988, including the removal of drums and underground storage tanks and the cleanup of a xylene wastewater spill. *See* ARTRA's Reply in Supp. of Mot. for Summ. J. at 10. The drum and underground storage tank removal, undertaken *prior* to the implementation or preparation of any remediation plan or permanent remedy, should be characterized as removal actions. *See* cases cited in note 2, *supra.*

Furthermore, these actions, which preceded the implementation of a permanent remedy, should be considered as one removal action for statute of limitations purposes. *See Kelley v. E.I. DuPont de Nemours and Co.,* 17 F.3d 836, 843–44 (6th Cir.1994) (surface removal operation and subsequent RI/FS (Remedial investigations/feasibility studies), including monitoring, assessing, and evaluating, constituted a single removal action for purposes of the statute of limitations); *see also Pneumo*

---

**2.** *See, e.g., United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 905 (E.D.Mich. 1998) (construction of drum storage pads did not constitute initiation of remedial activity); *State of Louisiana v. Braselman Corp.,* 78 F.Supp 2d 543, 548–49 (E.D.La.1999) (installation of monitoring wells was a removal action). Furthermore, the case cited by the defendant, *Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035, 1042 (S.D.Ga.1994), does not change this result. In that case, the

court held that the installation of a steel fence that *was listed as the first element of a final closure plan* constituted the initiation of remedial action. The construction of the drum removal pad and installation of monitoring wells in this case were initial actions taken in response to a state consent order and were not part of any final closure plan. The actions were not an "integral step in the implementation of the permanent remedy ...." *See Akzo,* 990 F.Supp. at 906.

*Abex Corp. v. Bessemer and Lake Erie R.R. Co.,* 936 F.Supp. 1250, 1261 (E.D.Va. 1996) (finding *Kelley* persuasive and concluding that plaintiffs' CERCLA claim was not barred by the statute of limitations because "their efforts have been continuous" and EPA had not yet approved the final cleanup plan); *Nutrasweet Co. v. X–L Eng'g Corp.,* 926 F.Supp. 767, 770–71 (N.D.Ill.1996) ( "CERCLA defines the single 'removal date' as the date of the last activity described in § 9601(23), such as monitoring, assessing, or evaluating a release of hazardous material.") The *Kelley* court also concluded that it would be "inconsistent" with CERCLA's purpose of providing for hazardous waste cleanup at the expense of responsible parties to "require suit on each arguably independent removal activity." *Kelley,* 17 F.3d at 843. Therefore, the actions here—drum and UST removal and other activities taken prior to the implementation of a permanent remedy—should constitute one continuous removal action for statute of limitations purposes, with the removal date being defined as the date of the last removal activity taken.

However, there is a dispute as to whether the excavation of soils which was completed on September 23, 1988 constitutes a removal or remedial action. This dispute need not be decided for purposes of the statute of limitations. If it is classified as a removal action and is deemed the last removal action, suit was filed on September 23, 1991, which is within the 3–year limitations period for removal actions. In addition, the installation of monitoring wells continued into 1990, which would constitute additional monitoring activities that may be characterized as a continuation of the removal actions, thus still falling within the 3–year period. If it is characterized as the initiation of remedial activity, it was initiated within three years of the completion of removal action, occurring on February 1988 (clean up of xylene wastewater), and therefore all of the costs would fall within the statute of limitations.

Therefore, even though the dividing line between removal and remedial actions in this case is far from clear, it is apparent that removal actions were ongoing at least through to some time in early 1988. Regardless of whether the soil extraction which was completed on September 23, 1988 is considered a removal or a remedial action, it was either within the statute as part of a continuous removal action, or was the initiation of a remedial action which occurred within three years of the completion of removal activity in February 1988. The CERCLA contribution claim is, therefore, not barred by the statute of limitations.

*Liability*

Section 9607(a) provides that:

> any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for ... any other necessary costs of response incurred by any other person consistent with the national contingency plan ....

42 U.S.C. § 9607(a); *see also Axel Johnson,* 191 F.3d at 414. Thus, ARTRA is potentially liable for contribution if: "(1) it owned or operated a facility at a time when 'any' hazardous substances were disposed of at the facility, and (2) there is 'a' release or threatened release of hazardous substances from the facility and that release or threatened release results in the incurrence of response costs" that are necessary and consistent with the National Contingency Plan. *Axel Johnson,* 191 F.3d at 414; 42 U.S.C. § 9607(a).

It is undisputed by the parties that ARTRA was an owner of the property that is the subject of this litigation. Furthermore, the property is a "facility," as that term is broadly defined in CERCLA, because the definition includes "any building, structure, installation, equipment, pipe ...

or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9). It is undisputed that hazardous substances were stored on ARTRA's property and have been detected throughout the soil and groundwater at the Hollins Ferry Road site. ARTRA does not dispute that it was an owner of a facility. Rather, ARTRA challenges the other elements necessary to establish its liability—that there was a disposal of a hazardous substance at the time it owned the facility, that there was a release or threatened release of a hazardous substance from the facility, that the release resulted in the incurrence of response costs, and that the costs incurred were consistent with the National Contingency Plan.

### A. Disposal and Release

■ CERCLA has adopted the definition of "disposal" found in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3). 42 U.S.C. § 9601(29). It is defined as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters. 42 U.S.C. § 6903(3).

Disposal includes depositing hazardous waste into enclosed containers such as drums or USTs. *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 846 (4th Cir.1992). Furthermore, a disposal may occur by spilling or leaking "without any active human participation." *Id.* at 845. "Release" is defined in CERCLA as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C.

§ 9601(22). The evidence demonstrates that there was both a disposal and a release during the time ARTRA owned the property.[3] Plaintiff has presented more than sufficient evidence to indicate that hazardous substances such as MEK, MIBK, toluene, xylene, methyl chloride, TCE, benzene, and TCA, were used by ARTRA during its ownership of the facility. These substances are hazardous substances as defined by CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4. Former employees have testified to numerous spills and leaks of these substances during ARTRA's ownership. A document drafted during ARTRA's ownership of the facility noted that there had been no spills of more than a few hundred gallons and there had been one tank failure. These are unquestionably releases, as statutorily defined. SW's expert concluded that a large portion of the contamination at the site came from USTs that began to leak during ARTRA's ownership. At the time of removal, several USTs contained holes. Furthermore, assessments performed by environmental consultants have concluded that these substances have been found in the groundwater and soil in the area.

ARTRA argues that the deposition testimony of the former employees is vague and speculative, in part because the employees were unable to precisely identify the quantity of waste released. It further argues that the spills discussed by former employees were minimal or infrequent. *See* Ex. 82, Def.'s Opp'n to Pl.'s Mot. for Summ. J. SW need not prove the quantities of chemicals or frequency of releases in order to prove by a preponderance of the evidence that ARTRA is liable under CERCLA for contribution. *See, e.g., HRW Systems,* 823 F.Supp. at 340; *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2nd Cir.1993). Moreover, SW need not "pinpoint[ ] at what precise point a leakage may have begun." *Nurad,*

---

3. The definition of "release" includes "disposal." Therefore, at least one court has held that where there is a disposal, there is a

release. *See HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 341 (D.Md.1993).

966 F.2d at 846. Other than these allegations regarding the speculative nature of the former employee testimony, ARTRA has presented no countervailing evidence to dispute the substance of their testimony.

CERCLA liability may be assessed on circumstantial evidence. *Crofton Ventures Ltd. Partnership v. G & H Partnership,* 116 F.Supp.2d 633, 639 (D.Md.2000) ("Of course, direct evidence is not essential and, indeed, might be rarely available in a CERCLA case."). Furthermore, the Fourth Circuit has warned against erecting barriers to recovery that were not intended under the CERCLA strict liability regime. *See United States v. Monsanto Co.,* 858 F.2d 160, 170 (4th Cir.1988) ("Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source ... 'To require a plaintiff under CERCLA to fingerprint waste is to eviscerate the statute.' "); *Axel Johnson,* 191 F.3d at 415. The only reasonable conclusion that a factfinder could draw, given the evidence presented, including former employee testimony, photographs, and expert testimony, is that there was a disposal and release of hazardous substances during ARTRA's ownership of the facility.

### B. Release Resulting in Incurrence of Response Costs

■ ARTRA argues that SW's proof "does not establish that the constituents later found to make up the contamination found in the mid–1980s were released before 1980 ...." ARTRA's Opp'n to SW's Mot. at 12. However, CERCLA does not require this level of proof. CERCLA was designed to be a strict liability regime under which strict causation requirements need not be met. *See Monsanto Co.,* 858 F.2d at 167 ("[T]he overwhelming body of precedent ... has interpreted [CERCLA] as establishing a strict liability scheme."); *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Comm'n,* 66 F.3d 669, 677 (4th Cir.1995) (stating that "courts must construe [CERCLA's] provisions liberally to avoid frustrating the legislature's purpose."). In *Axel Johnson,* a case almost directly on point on this issue, the Fourth Circuit stated that:

[t]here is no statutory requirement that in order for an owner or operator to be held liable for cleanup costs, the hazardous substances that cause the incurrence of those costs must be the *same* hazardous substances that were deposited at the facility when the party owned or operated it. Rather, under § 107 a former owner or operator can be held liable for response costs caused by hazardous substances that were deposited at the facility at times when it did not own or operate the facility, so long as some hazardous substances were deposited at the facility during the period when the party did own or operate it and the other requirements of the statute are met. *Axel Johnson,* 191 F.3d at 414.

Therefore, it is only necessary for SW to prove that a hazardous substance was disposed of and released during ARTRA's ownership of the facility and that SW later incurred response costs. As detailed above, the plaintiffs have presented ample evidence that there was a disposal and release of hazardous substances during ARTRA's ownership and SW has incurred costs to clean up hazardous substances on the property.

### C. Liability for the 200, 600, and 700 Areas and Drum Removal Costs

■ ARTRA has moved for partial summary judgment as to its liability for drum removal costs and for costs associated with the cleanup of the 200, 600, and 700 areas. With respect to the drum removal costs, it argues that SW has presented no evidence that the drums for which it seeks removal costs belonged to ARTRA, and it further argues that SW executed a release in November of 1983 that had the effect of foreclosing all future liability of ARTRA for costs of drum removal. With respect

to the cleanup of the 200, 600, and 700 areas, ARTRA argues that SW cannot recover costs for releases in those areas from ARTRA because SW has presented no evidence, namely expert testimony, that ARTRA's releases caused SW to incur response costs in those areas. ARTRA's attempt to divide the property for purposes of liability is unavailing, as a similar attempt has been very recently refuted by the Fourth Circuit. In *Axel Johnson,* the plaintiff, attempting to show that he was an innocent party capable of bringing a cost recovery action, argued that the property should be divided into separate facilities for liability purposes. In response to this argument, the Fourth Circuit stated that "[c]ourts have uniformly refused to divide widely contaminated properties ... into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property." *Axel Johnson,* 191 F.3d at 418. It is undisputed that contamination has been found throughout the facility involved in this case. Furthermore, as was detailed above, *Axel Johnson* makes clear that a plaintiff need not show that the hazardous substances which caused the plaintiff to incur response costs are the same substances that were deposited by the defendant. *See id.* at 414. Therefore, SW need not prove, for liability purposes, that specific substances that caused the incurrence of response costs in specific areas of a widely contaminated facility are the same substances that were disposed of by the defendant, nor must it prove the ownership of specific drums of waste.

A question does remain to be decided, though, as to whether these costs are recoverable as damages. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2nd Cir.1993) (finding that if the elements of a CERCLA claim are established and the defendant cannot rely on any defenses, that a plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to the measure of damages). ARTRA's arguments may apply later in this litigation, when the question of the specific damages that it must pay to SW is resolved. While this question is reserved, it should be noted that the documents which ARTRA suggests "release" it from liability for drum removal costs do not do so. While SW appears to have offered to close out liabilities for the removal of some drums through a letter written to ARTRA, ARTRA's mere payment of the costs requested in the letter does not in and of itself create a sufficient release from liability. Therefore, ARTRA's partial motion for summary judgment with respect to drum removal costs and the 200, 600, and 700 areas is denied, while the question of the specific damages to which SW is entitled will be resolved separately.

### D. Consistency with the National Contingency Plan

 In order to recover costs from ARTRA, SW must prove that the response costs it has incurred are consistent with the National Contingency Plan (NCP). *See* 42 U.S.C. § 9607(a)(4)(B); *White v. County of Newberry,* 985 F.2d 168, 174 (4th Cir.1993). Because SW has allegedly incurred response costs beginning in the early 1980s and continuing through to the present, its consistency with three separate NCPs must be considered—the 1982 NCP, the 1985 NCP, and the 1990 NCP. *See Washington State Dep't of Transp. v. Washington Natural Gas Co.,* 59 F.3d 793, 802 (9th Cir.1995) (looking to the NCP in effect at the time response costs were incurred). The 1990 NCP states that "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements ...." 40 C.F.R. § 300.700(c)(3)(I). While the standard for compliance with the 1990 NCP is clear from the language of the regulation, there has been considerable debate among the courts as to what standard of compliance should apply to consistency with the 1982 and 1985 NCPs. In each of these NCPs,

the standard for compliance was not set forth in the language of the regulation. Neither the Fourth Circuit nor this Court has directly answered this question. Therefore, this Court will adopt the reasoning of the several courts which have concluded that the 1990 NCP *clarified* that substantial compliance is the standard to be applied to consistency with the earlier NCPs. *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994); *Nashua Corp. v. Norton Co.*, 116 F.Supp.2d 330, 353 (N.D.N.Y.2000); *Reading Co. v. City of Philadelphia*, 823 F.Supp. 1218, 1240 (E.D.Pa.1993) (relying on EPA's introductory language to the new regulations which states that the revisions were intended to "clarify existing NCP language . . . ." 55 Fed.Reg. 8666 (1990)). Moreover, this interpretation comports with the premise, espoused by the EPA, that the requirement of consistency with the NCP was not meant to "defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party that has taken the response action." 55 Fed.Reg. 8793 (1990). Therefore, this Court will apply a substantial compliance standard to consistency with each of the NCPs.

Although the Fourth Circuit has not directly addressed the issue of the necessary level of compliance with the NCP, this Court has held on several occasions that in order to meet this element, it is only necessary for a plaintiff to prove that it incurred *some* response costs consistent with the NCP. This Court has held that:

> the plaintiff need only show that it has incurred *some* cost consistent with the NCP in order to maintain a CERCLA cause of action. So long as [the plaintiff] has demonstrated that some of its costs are recoverable under CERCLA, it is entitled to judgment on the issue of liability; proof of the consistency of the remaining costs may wait until trial on the issue of damages.

*Weyerhaeuser v. Koppers Co., Inc.*, 771 F.Supp. 1406, 1413 (D.Md.1991); *see also*

*Westfarm Assoc. Ltd. Partnership v. Int'l Fabricare Institute*, 846 F.Supp. 422, 431 (D.Md.1993), *aff'd* 66 F.3d 669 (4th Cir. 1995); *United States v. M/V Santa Clara I*, 887 F.Supp. 825, 842 (D.S.C.1995) (finding that evidence of compliance with an EPA administrative order was enough to satisfy the element of consistency with the NCP); *Nurad*, 966 F.2d at 841 n. 2 (finding that the district court's decision to resolve the issue of consistency with the NCP at the damages phase was within its discretion). Therefore, it is only necessary for SW to show that *some* of its response actions substantially complied with the NCP.

ARTRA argues that SW's 1984 drum removal did not comply with the 1982 NCP's removal requirements, and that SW's drum removal in 1985–1988, and its removal of USTs in beginning in 1986, did not comply with the 1985 NCP's removal requirements. Specifically, it argues that there was no determination made that there was a threat to public welfare or the environment before these removals, nor were preliminary assessments conducted. Furthermore, ARTRA argues that the soil excavation completed in September 1988 was a remedial action which did not comply with the 1985 NCP's requirements for remedial actions. Finally, ARTRA argues that many of SW's activities failed to meet the requirements for public participation and comment required by the 1985 and 1990 NCPs.

Several courts have held that government oversight of hazardous waste cleanup efforts may satisfy the public participation/comment element of the NCP. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2nd Cir.1998); *Union Pacific R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 838 (8th Cir.2000); *American Color & Chem. Corp. v. Tenneco Polymers, Inc.*, 918 F.Supp. 945, 957 (D.S.C.1995) ("This court agrees with that reasoning and recognizes that governmental agencies charged with protection of the public interest may serve as substitutes for partic-

ipation by individual members of the public, at least where the agency is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance ....”). At least one circuit has concluded that evidence of a state environmental agency's involvement with approving cleanup plans and monitoring remediation progress was sufficient to satisfy the requirement of consistency with the NCP as a whole, and not merely with respect to the public participation requirements. *See NutraSweet Co. v. X–L Engineering Co.*, 227 F.3d 776, 791 (7th Cir. 2000).

SW has met its burden of showing that at least some of its response actions substantially complied with the NCP. Both the drum and UST removal actions taken prior to 1990 substantially complied with the 1982 and 1985 NCP plans. These removal actions, which are not required to meet the more stringent requirements outlined for remedial actions, were taken at the direction of the MDE and were designed to effectuate the removal of sources of contaminants on the property that posed a risk to the environment. MDE was involved throughout the process of removing these tanks and drums. Furthermore, as to the remedial actions taken—the soil vapor extraction system installed in the 200 Area and the groundwater pump-and-treat system in the 100/500 area—it appears that SW, with the continuous involvement of MDE, assessed and investigated these areas, proposed alternative remedies, and provided opportunities for public comment through notices published in the *Baltimore Sun* (a local general circulation newspaper) prior to the initiation of the remedial actions. While SW has met its burden of showing consistency with the NCP for liability purposes, more proof may be considered as to which specific costs were or were not consistent with the NCP at the damages phase of this case. *See Weyerhaeuser*, 771 F.Supp. at 1414.

### Count III—CERCLA Declaratory Relief

 In its Motion, SW asks this Court to enter a declaratory judgment as to AR-TRA's liability for SW's future response costs pursuant to Section 113(g)(2) of CERCLA. ARTRA asks this Court to dismiss this count of the complaint as time-barred, based on its arguments regarding compliance with the statute of limitations for cost recovery and contribution actions. Because this Court has determined that SW's contribution claim is not barred by the statute of limitations, it follows that the claim for a declaratory judgment is likewise not time barred.

The section of CERCLA regarding declaratory judgments for future response costs provides that “the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.” 42 U.S.C. § 9613(g)(2). Courts have held that the provision in the statute regarding declaratory judgments applies to contribution actions brought pursuant to Section 113(f) as well as to actions brought to recover costs under Section 107, despite the fact that the statutory language appears in the section of the statute involving costs recovery actions brought under Section 107 and not in the section regarding contribution. *See Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191–92 (9th Cir. 2000); *Morrison Enters. v. McShares, Inc.*, 13 F.Supp.2d 1095, 1123–24 (D.Kan. 1998). This reading of the statute is consistent with the reading of the statute regarding the statute of limitations, which is based on the premise that an action for contribution incorporates the liability provisions applicable to cost recovery actions.

Furthermore, the Fourth Circuit has concluded that the entry of a declaratory judgment is mandatory in cases where there has been a judgment as to liability, holding that “[e]ven if multiple response cost actions exist or might exist, the court in the first action to reach decision is *required* to enter judgment as to liability

for the site." *Dent v. Beazer Materials and Servs., Inc.,* 156 F.3d 523, 532 (4th Cir.1998). Citing this Court's decision in *Fairchild,* discussed *supra,* the Fourth Circuit noted further that the speculative nature of future costs does not bar a present declaration of liability. *See id.* (quoting *Fairchild,* 766 F.Supp. at 415). Therefore, because this Court determined that ARTRA was liable to SW for contribution, SW is also entitled to a "mandatory" entry of a declaratory judgment for future response costs regardless of the speculative nature of those costs. *Dent,* 156 F.3d at 531.

Count IV—Common Law Indemnification

██ In Maryland, "[i]ndemnification is appropriate if there is a legal relationship mandating it, e.g. contract or respondeat superior, or when one party's role is so passive or secondary that it would be inequitable to require that party to sustain any of the burden of judgment." *Canjura v. Able Serv. Contractors, Inc.,* 866 F.Supp. 258, 261 (D.Md.1994); *Westfarm Associates Ltd. Partnership v. International Fabricare Institute,* 846 F.Supp. 422, 437 (D.Md.1993), *aff'd* 66 F.3d 669 (4th Cir. 1995). SW has asserted a claim for contractual indemnification in a separate count, and therefore this claim is viable only if SW's role is passive or secondary in relation to ARTRA's role in the contamination of the site, or, stated differently, only if SW was not actively negligent. *See Franklin v. Morrison,* 350 Md. 144, 163, 711 A.2d 177 (1998) ("It is well established under Maryland law that one who is guilty of active negligence cannot obtain tort indemnification."). In addition to its failure to address ARTRA's argument in support of its motion for judgment on the pleadings on this issue, SW has presented no evidence upon which a reasonable fact finder could rely which would show that it contributed only passively or secondarily to the contamination at the site. The evidence, including SW's own evidence, demonstrates that SW was subject to numerous enforcement actions by the State with respect to its storage and disposal of hazardous waste, and was an owner of the property at a time when spills of hazardous substances occurred. Furthermore, liability for indemnification is generally derivative of some finding of liability on the main claim at issue in the case. *Soper v. Kahn,* 568 F.Supp. 398, 404 (D.Md.1983). SW has not been held liable for any of the contamination at the Hollins Ferry Road site. Therefore, even viewed in a light most favorable to SW, the evidence does not warrant a shifting of the entire cost of cleanup to ARTRA under a common law indemnification theory. ARTRA's motion for judgment on the pleadings is therefore granted as to this theory.

Count V—Common Law Contribution

██ In Maryland, an action for contribution, like an action for indemnification, is derivative of a finding of liability on the main claim. *See id.* Therefore, in order to have a viable claim for contribution, SW must prove that it shares some common liability or obligation with ARTRA, whether in tort, contract, or by statute. SW and ARTRA are not joint tortfeasors, as there has been no finding that SW is liable in tort to the state or to any third party, and as will be discussed below, ARTRA is not liable to SW for negligence or nuisance. Therefore, there are no grounds for an action for contribution under the Maryland Uniform Contribution Among Joint Tort-Feasors Act, Md.Code Ann., Cts. & Jud. Proc. § 3–1401 *et seq.* ARTRA's potential contractual liability to SW will be addressed separately below.

The only remaining basis upon which SW may seek contribution from ARTRA must be based on some statutory right to contribution. While SW correctly cites to case law supporting this proposition, it broadly states that ARTRA is liable for contribution under state and federal law, without pointing to any specific provisions of law which create a common obligation between the parties as required by the court in *Lyon v. Campbell,* 324 Md. 178,

190–91, 596 A.2d 1012 (1991), a case cited by Sherwin–Williams itself. The state environmental statutes which SW was charged with violating in the 1980s do not create such an obligation, and CERCLA itself adequately addresses any claim for contribution that SW has against ARTRA. *See City of North Miami, Florida v. Berger,* 828 F.Supp. 401, 414 (E.D.Va.1993) ("Contribution issues arising from the release of hazardous substances ... are adequately addressed under the federal CERCLA action" when "no underlying tort or other cognizable state law claim has been asserted against the [plaintiff] so as to give rise to a claim for contribution under state law."). Therefore, because there are no grounds in tort or under state law for SW to seek contribution from AR-TRA, ARTRA's motion *for judgment on the pleadings* is granted.

Count VI—Breach of Contract/ Contract Indemnification

SW argues that the agreements signed by the parties regarding the sale of the assets and business of Dutch Boy (now ARTRA) to SW in 1980 contain language requiring ARTRA to indemnify SW for the costs of the cleanup of the property and for its legal expenses and attorney's fees. Specifically, SW points to section 8(b) of the Sales Agreement signed by the parties on July 31, 1980 and the Assumption Agreement signed by the parties on August 25, 1980. The relevant language is contained in the Assumption Agreement. It reads:

> Seller hereby retains and agrees to pay and discharge all other liabilities, obligations and commitments of Dutch Boy, whether known, unknown, contingent or otherwise, and whether or not disclosed to Purchaser or set forth in Dutch Boy's Financial statements or books, and any and all claims, losses, damages, expenses, costs, obligations, liabilities and commitments which may arise or result from from [*sic*] such liabilities, obligations, or commitments, that are not

specifically assigned to and assumed by Buyer under said Sections 8 and 13.

Section 8(a) of the Sales Agreement states that:

> Purchaser shall assume on the Closing Date and agrees to pay, perform and discharge (i) all liabilities and obligations of Seller under the leases, mortgages, license arrangements, contracts and other agreements set forth in Schedule 9 annexed hereto accruing and allocable to the period from and after the Closing Date and (ii) all other obligations relating to this transaction which are specifically set forth in this Agreement.

Section 8(b) states that:

> Except as expressly set forth in Section 8(a) and 13 hereof, [regarding employee and employee benefit matters] Purchaser shall not assume, agree or be obligated to pay, perform or discharge any debts, liabilities, leases, mortgages, licenses, or other obligations of Seller, whether now existing or hereinafter arising for whatever reason; and, without limiting the generality of the foregoing, Purchaser shall not assume or pay, perform or discharge ... (v) any liability or obligation with respect to any claim, action, suit, or demand or any legal, administrative or other proceeding or judgement with respect to causes of action arising out of Seller's ownership of Seller's Coatings Division or the Assets prior to the Closing Date or arising from a product manufactured prior to the Closing Date.

 CERCLA allows parties to shift CERCLA liability through the use of an indemnity or assumption agreement that was entered into prior to the enactment of CERCLA. *See Dent v. Beazer Materials and Servs., Inc.,* 156 F.3d 523, 534 (4th Cir.1998); *Beazer East, Inc. v. Mead Corp.,* 34 F.3d 206, 211 (3rd Cir.1994). The interpretation of the indemnity provision is governed by state law, in this case Ohio law, in accordance with the express choice of law provision in the agreement. *See Olin Corp. v. Yeargin Inc.,* 146 F.3d

398, 407 (6th Cir.1998); Section 30 of the Sales Agreement.

Under both Ohio and Maryland law, the interpretation of an unambiguous contract is a matter of law for the court. *See Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991); *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.,* 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined."); *Federal Leasing, Inc. v. Amperif Corp.,* 840 F.Supp. 1068, 1073 (D.Md.1993). Furthermore, the right of a party to be indemnified when a written contract is involved requires that the agreement "be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings." *McClorey v. Hamilton County Bd. of Elections,* 130 Ohio App.3d 621, 625, 720 N.E.2d 954 (1998).

■ The Fourth Circuit has adopted the Third Circuit's method for determining the validity of pre-CERCLA assumption and indemnification agreements, stating that "whether a pre-CERCLA indemnification provision was intended to cover CERCLA claim [*sic*] depends upon whether it is 'either specific enough to include CERCLA liability or general enough to include any and all environmental liability.' " *Dent,* 156 F.3d at 534 (quoting *Beazer East,* 34 F.3d at 211); *see also White Consol. Industries, Inc. v. Westinghouse Elec. Corp.,* 179 F.3d 403, 409–410 (6th Cir.1999). Therefore, it is not necessary for environmental liability to be specifically allocated to one of the parties if the agreement is general enough to include all environmental liability. In *Dent,* the Fourth Circuit determined that language providing that " '[Beazer] agrees to save [Conoco] harmless from any and every claim arising out of the use by [Beazer] of the demised premises' " was sufficiently

general and in fact "could not be more general." *Dent,* 156 F.3d at 534.

The Assumption Agreement at issue in this case provides that "Seller [Dutch Boy, now ARTRA] hereby retains and *agrees to pay and discharge all other liabilities,* obligations and commitments of Dutch Boy, whether known, unknown, contingent or otherwise, ... and any and all claims, losses, damages, expenses, costs, obligations, liabilities and commitments which may arise or result from from [*sic*] such liabilities, obligations or commitments, that are not specifically assigned to and assumed by Buyer [Sherwin–Williams] under said Sections 8 and 13." (emphasis supplied). The only liabilities assumed by the buyer, SW, under Sections 8 and 13 include any liabilities relating to leases, mortgages, license arrangements, employee matters, and other *specific* obligations under the agreement. Environmental liabilities were not mentioned in either the original Sales Agreement or the Assumption Agreement. Therefore, the language in the Assumption Agreement is sufficiently general to encompass all remaining liabilities that were not specifically allocated to SW in either of the agreements and is sufficient to require ARTRA to indemnify SW for at least that part of the CERCLA liability that is determined to be attributable to ARTRA's ownership of the Coatings Division or the assets prior to the closing date.

■ ARTRA argues in its motion for partial summary judgment on this issue that even if the assumption agreement entitles SW to be indemnified for the costs that it has incurred that are attributable to ARTRA's ownership, SW's claim is nonetheless barred by the statute of limitations. While Ohio law applies to the construction of the contract between the parties, Maryland's statute of limitations will apply. The Maryland courts have followed the general rule that the statute of limitations of the forum state applies even when that state's choice of law rules require that another state's substantive law be applied. *See Morley v. Cohen,* 610 F.Supp. 798, 827

(D.Md.1985). This is true even when, as here, the contract explicitly includes a choice of law provision specifying that out-of-forum law applies to the agreement, because the statute of limitations is a procedural, rather than a substantive, issue. *See id.* Therefore, applying Maryland law, the applicable statute of limitations is three years. *See* Md.Code Ann. Cts. & Jud. Proc. § 5–101.

▮ With regard to the date that a claim for contract indemnification accrues, Maryland applies the rule that the claim accrues at the time payment was made by the party seeking indemnification. *See Southern Maryland Oil Co. v. Texas Co.,* 203 F.Supp. 449, 452–453 (D.Md.1962). SW has made multiple payments to clean up the contaminated property, beginning in 1984 and continuing through to the present. Therefore, there is a question as to whether this cause of action accrued once and for all on the date the first payment was made, or whether each payment by SW restarted the running of the statute of limitations.

In *Singer Co. v. Baltimore Gas and Elec. Co.,* 79 Md.App. 461, 475, 558 A.2d 419 (1989), the Maryland Court of Special Appeals held that:

> where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations.

Applying the rule in *Singer* to claims for indemnification, the Court of Special Appeals held that "[w]here the duty to defend and potentially to indemnify might attach, the failure to perform that duty with respect to each separate claim would constitute a distinct breach." *Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 656, 698 A.2d 1167 (1997). *See also Dameron v. Sinai Hosp. of Baltimore,* 815 F.2d 975, 982 (4th Cir.1987)

(finding in ERISA case that defendant's failure to pay pension to retirees on a monthly basis constituted a series of successive breaches and plaintiff could recover for those breaches that occurred within the limitations period). Therefore, each payment that SW made, and for which it seeks to be indemnified, would begin the running of the statute of limitations anew, and SW is only entitled to recover for those costs it incurred within three years of the time it filed suit, September 23, 1991. Thus, SW's claim for contract indemnification for any costs it incurred prior to September 23, 1988, is time barred, but it is entitled to be indemnified for those costs incurred within the limitations period and beyond, which are attributable to ARTRA's ownership of the paint facility and assets. This does not limit SW from obtaining damages under CERCLA for costs it incurred prior to September 23, 1988. The result of this ruling is that SW has two viable roads to recovering its response costs, depending on the result of the later part of this litigation to determine damages: (1) ARTRA is statutorily liable to SW for contribution for its clean-up costs and (2) ARTRA is contractually obligated to indemnify SW for costs SW incurred after September 23, 1988.

Count VII—Negligence

*Statute of Limitations*

▮ ARTRA argues in its motion for judgment on the pleadings that SW's negligence claim is barred by the applicable three year statute of limitations. *See* Md. Code Ann., Cts. & Jud. Proc. § 5–101. In Maryland, the discovery rule governs the time of accrual of a cause of action *ex delicto.* Under this rule, the cause of action accrues "at the time the plaintiff had actual knowledge *or* implied knowledge of the existence of the cause of action." *Weyerhaeuser,* 771 F.Supp. at 1415. This requires either "express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry

... with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677 (1981).

SW alleges in its Complaint that AR-TRA "wrongfully, illegally and negligently failed to deliver to Sherwin–Williams *at the time of the transfer of ownership* of the Site a site that was environmentally clean and safe." Compl. at ¶ 52 (emphasis supplied). Furthermore, in 1985, SW signed a consent order with the state of Maryland regarding the improper storage of drums and incurred cleanup costs associated with the drums. *See* Compl. at ¶¶ 58–59. Therefore, it is clear that SW knew or should have known about the contamination of the property either at the time it purchased the property in 1980 or when it first incurred cleanup costs in 1984 and 1985. Using either date as the date of discovery, the cause of action for negligence, having been filed in September of 1991, is time barred.

Even were this claim not time barred, judgment on the pleadings in favor of the defendant would still be appropriate on it. The Maryland Court of Appeals has held that a prior occupant of land owes no duty to a subsequent occupant of that land for losses resulting from a condition on the property that could have been discovered and addressed prior to occupancy. *See Rosenblatt v. Exxon*, 335 Md. 58, 77, 642 A.2d 180 (1994); *Rossaki v. NUS Corp.*, 116 Md.App. 11, 19–21, 695 A.2d 203 (1997). SW argues that these cases should not apply here because they were decided after the Complaint was filed in this case. However, plaintiffs' position is contrary to the general rule that "a court will apply judicial case law as that law exists at the time of decision." *Cash v. Califano*, 621 F.2d 626, 628 (4th Cir.1980). If that contrary position is to be adopted—a rule of nonretroactivity—the party wishing for it to be applied must establish "the necessary equitable predicate." *Id.* at 629. SW has not satisfied this burden.

Count VIII—Nuisance

■■■ ARTRA argues in its motion for judgment on the pleadings on SW's nuisance claim that SW, as a subsequent occupier of the land, has no cause of action for nuisance for activities conducted on the land during a prior owner's occupancy.[4] This Court recently stated that "Maryland courts do not recognize the right of a subsequent occupant of land to bring an action in private nuisance against a prior occupant for activities conducted on the land during the prior occupancy." *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D.Md.2000) (citing *Rosenblatt*, 335 Md. at 79–80, 642 A.2d 180). Therefore, SW, as a subsequent occupier of land, may not bring an action for nuisance against the prior owner, ARTRA.

CONCLUSION

In light of the above, a separate order will be issued as follows: As to Count I (CERCLA cost recovery), SW's motion for partial summary judgment is DENIED,

---

4. ARTRA raises the statute of limitations as an alternate ground for granting judgment on the pleadings in its favor on the nuisance claim. The application of the statute of limitations turns on whether the alleged nuisance is defined as temporary or permanent. If a nuisance is permanent, an action must be brought "within three years of the time that the permanency of the conditions ... became manifest to a reasonably prudent person ...." *Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673; 689, 404 A.2d 1064 (1979). If, on the other hand, the nuisance is temporary, "successive actions may be brought for damages for each invasion ... but recovery may only be had for damages actually sustained ... within three years of the filing of the action." *Id.* at 690 n. 4, 404 A.2d 1064. According to Maryland courts, a temporary nuisance is one that can be abated, while a permanent nuisance is one that "will be presumed by its character and circumstance to continue indefinitely." *Moy v. Bell*, 46 Md. App. 364, 371, 416 A.2d 289 (1980). Because the issue of whether or not the conditions on SW's property are abatable was not addressed by the parties, and because the nuisance claim will be dismissed on other grounds, the Court declines to decide which statute of limitations would apply to this action.

and ARTRA's motion for judgment on the pleadings is GRANTED. As to Count II (CERCLA contribution), SW's motion for partial summary judgment is GRANTED, and ARTRA's motion for partial summary judgment is DENIED. As to Count III (declaratory judgment), SW's motion for partial summary judgment is GRANTED, and ARTRA's motion for partial summary judgment is DENIED. As to Count IV (common law indemnification), ARTRA's motion for judgment on the pleadings is GRANTED. As to Count V (common law contribution), ARTRA's motion for judgment on the pleadings is GRANTED. As to Count VI (contract indemnification), SW's motion for partial summary judgment is GRANTED with respect to those costs incurred within the limitations period, and ARTRA's motion for partial summary judgment is DENIED, except that it is GRANTED to the extent that claims falling outside the statute of limitations are barred. As to Counts VII and VIII (negligence and nuisance), ARTRA's motion for judgment on the pleadings is GRANTED. Finally, ARTRA's motion for summary judgment on the issue of SW's alleged failure to comply with the National Contingency Plan is DENIED and ARTRA's motion for partial summary judgment as to drum removal costs and the 200, 600 and 700 areas is DENIED.

The only issue that remains to be decided is the amount of damages that should be awarded to SW. The parties' suggestions as to how to proceed on this issue, including whether a reference to a Magistrate Judge or other intermediary for mediation or other resolution of this issue would be appropriate, should be submitted within 15 days of the date hereof. In addition, the parties' positions regarding the continuing viability of any claims against the remaining parties in this case should be addressed.